# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN ELECTRONIC DEVICE, CURRENTLY LOCATED AT THE FBI LEXINGTON RESIDENT AGENCY | Case No. 21-MJ-5165 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **William J. Jackson**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a U.S. Deputy Marshal with the United States Department of Justice, Federal Bureau of Investigations (FBI), and a Detective with the University of Kentucky Police Department and have been since 2005.  I am a graduate of the Kentucky Department of Criminal Justice Training Police Academy and a Federal Law Enforcement Officer as defined in Rule 41 and am authorized by Federal Law to request a search warrant.  I have received specialized training in the enforcement of federal criminal laws, including fraud, racketeering, violent threats to life, terrorism, computer fraud, money laundering, and explosive devices. My training and experience has involved, among other things: (1) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the methods of perpetrating criminal activities; (2) surveillance; (3) analysis and processing of documentary, electronic, and physical

evidence; (4) and the execution of arrest and search warrants.  I have personally conducted and assisted in investigations involving terrorism, threats of violence, wire fraud, mail fraud and money laundering.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      For the reasons discussed below, I respectfully submit that this Affidavit contains probable cause to believe that Bryan CARROLL has committed violations of 18 U.S.C. §§ 875(c) (interstate communications), 922(g) (possession of a firearm by a prohibited person), 924(c) (possession of firearm in furtherance of crime of violence), 2261A(2) (cyberstalking) and 26 U.S.C. §§ 5861(d) (possession of unregistered destructive device) and 5861(f) (making of firearm or destructive device).  I also submit that evidence of those crimes will be found on Device 1, which is described in more detail below.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The device to be searched will be hereinafter referred to as Device 1:   a white in color, Alcatel model 5044R cellular phone, IMEI 015026000137065.

6.      Device 1 is currently located at the FBI Lexington Resident Agency, 1648 McGrathiana Parkway, Suite 250, Lexington, KY 40511.

7.      The applied-for warrant would authorize the forensic examination of Device 1 for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.      On or about February 27, 2021, a Versailles Police Department Officer made contact with a female hereinafter referenced as "Witness 1."  The officer verified Witness 1's identity and confirmed that Witness 1 was a family member of Bryan T. Carroll (hereinafter,

2

"CARROLL"). Witness 1 alleged that CARROLL had assaulted her at a residence shared by CARROLL and his parents, located at 218 Aberdeen Road in Versailles, Woodford County, Kentucky.[1] Witness 1 advised that she went to the residence to take CARROLL'S parents to obtain their second round COVID injection. While at the aforementioned residence, she reported that she observed spoiled food and poor conditions. Witness 1 advised that CARROLL was to be taking care of the residence since he was living there. Witness 1 stated that CARROLL became upset and began yelling and throwing things inside the residence. Witness 1 stated that CARROLL became violent, grabbing her and throwing her onto a couch before punching her. Witness 1 stated that CARROLL then pinned her arms down and began choking and strangling her. Witness 1 stated that, after several minutes he got off of her and threw her phone, breaking it. She stated that CARROLL told her that if she called the police he would kill everyone. Witness 1 reported that CARROLL then grabbed his "AK-47" rifle with high-capacity magazine and escorted her out of the residence, locking her out.

9.       On March 1, 2021, a Versailles Police Detective conducted a strangulation supplement report with Witness 1, detailing more information regarding the aforementioned incident. Witness 1 advised that CARROLL mounted her, pinning her hands back. She stated that CARROLL then took his right hand and began strangling her on two separate occasions lasting between 20-30 seconds each time. Witness 1 further detailed that during the time he was strangling her, he was also banging her head down and assaulting her face. According to Witness 1, CARROLL stopped strangling her when CARROLL's father began yelling at him. Witness 1 stated that, after CARROLL got off of her, he threw her phone and told her if she

_____

[1] This address is CARROLL's address of record, as it appears on his Kentucky Operator's license.

called the police he was going to kill everyone including the police.  Witness 1 stated that CARROLL went to his bedroom, retrieving an "AK-47" rifle with a fifty (50) round magazine. According to Witness 1, CARROLL had at least ten (10) firearms throughout the house and kept them loaded.

10.    During the investigation of CARROLL, on March 18, 2021, Versailles Police investigators observed CARROLL operating a 2000 GMC Pickup bearing Kentucky registration 242-FWH (VIN 1GTGK24U4YE142528), which is registered to CARROLL's father.[2]  As investigators attempted to make contact with CARROLL due to an active failure to appear warrant, CARROLL was able to successfully flee from police in the GMC Pickup.

11.    On March 25, 2021, officers of the University of Kentucky Police Department (UKPD) observed CARROLL at the University of Kentucky (UK) Emergency Room.  UKPD officers had been advised that CARROLL was a "dangerous fugitive" who was potentially armed, was suspected of making improvised explosive devices (IEDs), and had expressed his intent to commit violence.  UKPD officers had also been advised that CARROLL was enroute to the hospital in a dark colored Honda CRV.  UKPD officers were provided a photograph of CARROLL and informed that he had an active warrant for his arrest from Woodford County (KY) Sheriff's Office (Warrant #W353182334) for failure to appear in his state case involving a charge of Dangerous Drugs-Possession of a Controlled Substance.  The UKPD Emergency Operations Center (EOC) was actively monitoring surveillance cameras at the hospital and observed CARROLL arrive and park outside the doors of the UK Emergency Room and enter the hospital.  Upon CARROLL's departure from the hospital, UKPD officers attempted to place

---

[2] In August of 2020, CARROLL was cited by Lexington Police while operating this vehicle.

CARROLL under arrest, and after a brief foot pursuit were able to do so. UKPD officers conducted a search of CARROLL's person incident to the arrest and located upon his person two handguns, a Smith and Wesson Bodyguard, .380ACP pistol (S/N:KEX0874) loaded with 6 rounds of .380ACP ammunition, and a Kahr Model PM9, 9mm pistol (S/N:ID4261) loaded with 7 rounds of ammunition. UKPD officers also found Device 1 on CARROLL's person during the arrest.

12.     UKPD officers observed a male, later identified as CARROLL's father, sitting in the front passenger seat of the vehicle operated and controlled by CARROLL, at the time of the arrest. UKPD officers ordered CARROLL's father from the vehicle, conducted a frisk of him, and escorted him to a safe area. From outside the vehicle, UKPD officers observed in the rear passenger seat the barrel and muzzle brake of an AK-style rifle, partially covered by a jacket. Based on these circumstances, officers entered the vehicle to secure the weapon. Upon entering the vehicle, officers also observed the presence of an AR-style rifle that was located adjacent to the AK-style rifle. Officers observed that a magazine had been loaded into the well of each rifle, but that neither rifle contained a round in the chamber. UKPD officers continued to search the vehicle to secure the weapons and ammunition and make the scene safe. In the course of this search, UKPD officers located an ACU camouflaged body armor, a home-manufactured armor plate carrier, a web belt with numerous pouches, a black in color pouch that resembled a toiletry bag and contained devices that UKPD officers immediately suspected as IEDs, and other suspected IEDs. UKPD officers immediately evacuated the scene and requested assistance from Lexington Police Department's Hazardous Devices Unit and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).

13.     ATF personnel examined the firearms seized from CARROLL's person and provided Affiant with information about them based on ATF training and experience in past investigations.  ATF SA James Freeman advised the Smith and Wesson Bodyguard, .380ACP pistol, and a Kahr Model PM9, 9mm pistol are firearms as defined under Federal law and are manufactured outside the commonwealth of Kentucky.  Also, on March 25, 2021, Affiant reviewed a criminal history queried via NCIC and the Kentucky Administrative Office of the Courts.  These checks revealed that CARROLL was previously convicted of Complicity to Trafficking in Controlled Substances, 1st Degree, 1st Offense, and was issued a two (2) year and six (6) month prison sentence in Woodford County Circuit Court Case #12-CR-00074.  Additionally, CARROLL was also convicted of Assault 4th Degree Domestic Violence (Minor Injury) in Woodford County District Court Case #09-M00120, and Assault 4th Degree Domestic Violence (Minor Injury) in Woodford County Court Case 14-CR-00060.  Based on training and experience, Affiant knows that the aforementioned convictions constitute qualifying disabilities to possess firearms and ammunition under Federal law.

14.     Additionally, ATF Task Force Officer (TFO) Joe Duerson examined the IEDs recovered from CARROLL's vehicles and provided Affiant photographs and descriptions of them.  ATF has informed Affiant that, at this time, none of these IEDs has been exploited for measurements or testing.  Thus, the summaries that follow are based on ATF's observation of the IEDs and the training and experience of ATF personnel:

    a.  IED 1 - A round metal can wrapped in white tape labeled in black marker with "soup" on the top lid of the cylinder.  The length of hobby fuse is visible on the outside of the can.  X-ray diagnostics show the item to contain nails along the inside wall with an unknown powder that is consistent with the morphology of an

6

energetic powder.  This device has not been exploited by ATF Certified

Explosives Specialists (CES) or Explosive Enforcement Officers (EEO)

personnel.  Based on the training and experience of ATF investigators and the

construction of IED 1, however, investigators have determined the probable intent

for IED 1 was to light the fuse with a flame from a match or lighter to ignite the

hobby fuse, which was embedded in the energetic material.  The fuse would ignite

the powder, causing a rapid release of gas projecting nails and metal pieces, the

probable intent being to cause death or serious physical injury.  A photograph of

IED 1 follows:



b. IEDs 2 and 3 - Both of these items are round cylinder shapes of cardboard

construction wrapped in white tape.  Both have a visible green length of hobby

fuse protruding from the side of the item.  X-ray diagnostics show the

construction and morphology of the powder consistent with that of a pyrotechnic

mortar device (1.4 Consumer Firework) with a lift charge and a breaking charge

located in its interior.  These two items were the black pouch referenced above.
The same pouch contained butane lighters and a variety of matches.  IEDs 2 and 3
were both possessed and stored outside of the manufacturer's recommended use.
Based on the training and experience of ATF investigators and the construction of
IEDs 2 and 3, investigators have determined the probable intent for these devices
was use as hand thrown grenades or as distraction devices to cause panic, fear and
alarm.  Should either of these devices go off near a person, it could cause injuries
to include tympanic membrane rupture and loss of eyesight.  A photograph of
IEDs 2 and 3 follows:



c.  IED 4 - This device is also consistent with that of a 1.4 consumer firework mortar.
This item was wrapped in black tape with a length of green hobby fuse protruding
from the top of the item.  X-ray diagnostics also confirm its consistency with that
of a mortar firework with a lift charge and a breaking charge located in its
interior.  This item was also possessed outside the manufacturer's suggested use.
If this device was to be used as a consumer firework, it likely would have been

8

contained within a mortar tube. No mortar tube was found in conjunction with IED 4. Based on the training and experience of ATF investigators and the construction of IED 4, the probable intent for this device was to be used as a hand thrown grenade or as a distraction device to cause panic, fear and alarm. Should this device go off near a person it could cause injuries to include tympanic membrane rupture and loss of eyesight. A photograph of IED 4 follows:



d. IED 5 - This device is also consistent with that of a 1.4 consumer firework mortar. This item was wrapped in gray tape with a length of green hobby fuse protruding from the top of the item. X-ray diagnostics also confirm its consistency with that of a mortar firework with a lift charge and a breaking charge located in its interior. This item was also possessed outside the manufacturer's suggested use. If this device was to be used as a consumer firework, it likely would have been contained within a mortar tube. No mortar tube was found in conjunction with

IED 5.  Based on the training and experience of ATF investigators and the

construction of IED 5, the probable intent of this device was to be used as a hand

thrown grenade or as a distraction device to cause panic, fear and alarm.

However, should this device go off near a person it could cause injuries to include

Tympanic membrane rupture and loss of eyesight.  A photograph of IED 5

follows:



15.     Following his arrest, CARROLL was given *Miranda* warnings and was

interviewed by agents from the FBI and ATF.  That interview was audio-recorded, and Affiant

has reviewed that recording and prior summaries of the interview.  The interview spanned

multiple hours and covered various topics, including the information contained in the brief summary that follows:

    a.   CARROLL acknowledged to agents that he is a convicted felon, which prohibits him from legally possessing firearms and explosives.  CARROLL said he had not had his rights to possess firearms and explosives restored since his felony conviction.  CARROLL also told agents that the firearms located by UKPD officers on his person belonged to him.  CARROLL told agents he had more firearms at his residence in Versailles, Kentucky.

    b.   CARROLL claimed to be an "explosives guy" and, at various points in the interview, referred to his love for and knowledge about explosives, while clarifying that he was not formally trained or an expert on the subject. CARROLL also claimed he had "good teachers" in making explosives, but declined to give information about the identities of those "teachers."  CARROLL told agents he had been playing with and building explosives since he was young. CARROLL admitted to making numerous explosive devices and was questioned on the construction of IED 1, which he called a "soup can."  CARROLL discussed the layer of nails wrapping IED 1.  CARROLL stated he made "soup cans" like IED 1 to test how far the device would throw the shrapnel.  CARROLL briefly described his process for testing "soup cans", informing agents that he and an undisclosed other person or persons would hide behind armored vehicles at least 500 to 600 feet away during detonation.  When questioned, CARROLL refused to identify the other person(s) present during his testing or their role(s) in CARROLL's activities.

11

c.  CARROLL admitted to making all of the explosives contained in his residence, including his garage.  CARROLL told agents that he had begun keeping explosives at his residence approximately two years ago.  CARROLL told agents that the freezer in his garage contained a quantity of triacetone triperoxide (hereinafter, "TATP").  CARROLL marked up a floorplan of the residence provided to him by agents, primarily to demonstrate the locations of the explosive-making material and completed explosives within and around the residence and to identify safe entry points.  CARROLL also vaguely referenced other places away from the residence where his explosives were stored.  When questioned, CARROLL declined to disclose those places and claimed that the other locations did not contain booby traps or explosives that were primed, charged, or that would explode.

d.  CARROLL refused to disclose where he got the materials used to manufacture the explosives and devices previously discussed.   CARROLL referenced a market for the TATP he had manufactured.   At various points during the interview, CARROLL used the terms "we" and "they" in reference to his activities, but he consistently refused to identify who he was referencing.  However, CARROLL claimed to be affiliated with militias across several states and Mexican drug cartels, among other groups engaged in criminal activities.

e.  As CARROLL marked up the aforementioned floorplan, he identified two bedrooms as his rooms.  Although CARROLL shared the residence with both of his parents, he informed agents that only he accessed and used these two bedrooms.

12

      f.   CARROLL stated the telephone taken from his person during his arrest was assigned telephone number 859-753-6708.

16.    ATF personnel obtained a warrant authorizing a search of CARROLL's residence at 218 Aberdeen Road in Versailles, Kentucky.[3]  Upon execution of this warrant, investigators identified numerous firearms, ammunition, several explosive devices, and components apparently possessed to manufacture additional explosive devices.  Investigators also located primary explosives, including various amounts of ammonium nitrate and diesel fuel oil mix along with fourteen pounds of TATP within a freezer in the garage.  In the two bedrooms identified by CARROLL as his, investigators found a pipe bomb constructed of steel pipe and end caps, a cellular telephone attached to a propane cylinder, with wires wrapped around the cellular telephone and running to a PVC pipe believed to be explosives, commercial fireworks, six 1.4 mortars, eight additional cellular telephones, a notebook, and other relevant items.

The notebook contained CARROLL's writings, including the following statement:[4]

> My fate is sealed & done.  I know I am going to die soon but I cannot explain why or how this will happen.  I went far right since Biden took office.  I do not agree with 90% of his beliefs, most men with the power of his position do not know the simple solutions to fix broken problems.  This entire country is in such a hurry to get something and or somewhere.  That's what everyone wants "something & to be somewhere.["]  Myself I want my parents to be happy health, [A.H.] to be my only love & wife, best of health to her, [B.], [L.], and [J.]  I would love to have love between [M.] & [B.]  I truly do love my family more than anything in the world.  I do not believe any one man or woman should be permitted to judge another for petty crimes or drug use.  Agreed, child abuse, forced rape, unjustified murder shall be punishable by

---

[3] See Case No. 5:21-MJ-5118-MAS.

[4] Individuals identified in CARROLL's notebook include various minors and are referenced here only by their initials.

> decent men.   Any one person that has any drug, alcohol, or
> substance abuse will undergo their own punishment & suffering by
> the lifestyle that follows the use.  Its so called "CARMA" [sic].  I
> believe every person should live by the Constitution and common
> law.  People believe in the Bible, Christ, God, etc. & that follows.
> At this year in time people know common law & Constitution was
> in fact well & truthfully known to work for mankind.  At year 20th
> century know [sic] man truly knows if Jesus Christ, or God truly
> exist.  All children are & will be victims of the path of destruction
> mankind – people has paved & structured left behind.

17.     Regarding the fourteen pounds of TATP seized from the freezer in CARROLL's

garage, ATF personnel informed me that this was the largest TATP cache they had seized within

the United States to date.  I know, based on training, experience, and consultation with

explosives experts within the FBI and the ATF, that TATP is a primary explosive that can be

manufactured with household equipment and commercially available chemicals.  I also know

that manufacturing the quantity of TATP located in CARROLL's garage would require the

acquisition of large amounts of its precursor chemicals (acetone and hydrogen peroxide) and an

acidic catalyst (often sulfuric acid).  These chemicals are available for purchase by individual

consumers in undiluted form or as part of other substances such as nail polish removers, car

batteries, and bleach.  Similarly, the ammonium nitrate found in CARROLL's garage can be

obtained through materials readily available to individual consumers such as fertilizer and cold

packs.  Each of these items are available for purchase over the internet.  During the search of

CARROLL's garage, law enforcement located empty bulk-quantity cold pack boxes. In the

investigation, the FBI received general information that CARROLL had received several

shipments from medical suppliers.

18.     On July 14, 2021, pursuant to legal process, FedEx Ground provided records to

the FBI indicating CARROLL received five shipments from Medline Industries delivered to 218

Aberdeen Road, Versailles, Kentucky beginning approximately on October 1, 2020.  The FBI conducted a search of open source information and determined Medline Industries is a manufacturer and distributor of medical supplies to include the cold packs found in the garage of CARROLL's residence.

19.     The FBI has also interviewed CARROLL's previous wife, who will be hereinafter referenced as "Witness 2."  The FBI confirmed Witness 2's identity.  Witness 2 told the FBI that she and CARROLL have children together and remain in contact with each other because of the children.  In the last several years, Witness 2 thought CARROLL had grown more and more paranoid.  In or around October 27, 2020, CARROLL sent Witness 2 an email titled "The Truth" in which CARROLL wrote "Truth is I don't have any one to talk to.  The closest people in my life are my mom and dad.  If they knew what's going on and the things that are going to happen, it would upset them so much, and they wouldn't understand either."  Witness 2 expressed belief that the email was partially due to CARROLL's drug use.  When Witness 2 pressed CARROLL on the meaning of the email, CARROLL responded that something bad was going to happen to him and he was not wanting to "push their stuff" any longer.  CARROLL mentioned Mexican cartels, but would not elaborate, only telling Witness 2 "the more you know the worse it'll be for you."   In or around December 2020, Witness 2 noticed CARROLL had begun to express worry about police coming after him.  Witness 2 related that CARROLL told her on more than one occasion that he was "not going alive."  CARROLL began sending Witness 2 numerous text messages to the point that Witness 2 blocked CARROLL's telephone number.  Witness 2 knew CARROLL to utilize several different telephone numbers in the past.  According to Witness 2, CARROLL utilized telephone number 859-753-4909 consistently for several years, but also began using telephone number 859-753-6708 to contact Witness 2.  CARROLL sent so many

text messages to Witness 2 that she labeled his telephone numbers as "Do Not" for telephone number 859-753-4909 and "Do Not Answer2" for telephone number 859-753-6708.  Witness 2 allowed agents to image one of the phones on which she had received messages from CARROLL.  A review of the phone indicated Witness 2 received messages from CARROLL as early as March 27, 2020.  Below is a summary of certain pertinent messages observed on the phone provided by Witness 2, along with context explained by Witness 2 where applicable:

    a.   On December 21, 2020, Witness 2 received a text message from the phone labeled "Do Not Answer2", stating, "And fyi I'm have [sic] VA federal FBI hostage negotiations officer that's going to help me get through this if you really need to know.  See nobody gonna die unless my hands forced and I'll fuck up three towns in 6 hours before these fucks know wtf happened if I wanted to.  I'm not threatening but I'm a man I'm a rare breed and very capable.  The right people know and thats what counts."

    b.   Also in December 2020, Witness 2 received a text message from CARROLL stating, "This is my last Christmas on earth. I'm coming to see my boys period." CARROLL immediately followed this with a text message stating, "Bandaids don't fix bullet holes! Bitch."

    c.   In mid-March 2021, CARROLL continued sending Witness 2 text messages stating he was being chased by police and that Witness 2 would not hear from CARROLL again.  For example, on March 16, 2021, Witness 2 received a text message from the phone labeled "Do Not Answer2", stating, "I'm a wreck, I'm wanted, it's hard to work dodging the cops, they keep driving by . . . ."  Witness 2 later told the FBI that she called CARROLL in response to this message, because

she interpreted this to show CARROLL's progression from paranoia to the point where he might act on his threats.  During the conversation, Witness 2 recalled this was the first mention by CARROLL that he (CARROLL) was going to get his guns and bombs.   Witness 2 expressed belief CARROLL would use the guns and bombs against law enforcement upon an attempt to arrest CARROLL.

d.  On March 18, 2021, Witness 2 received a text message from the phone labeled "Do Not Answer2", stating "Don't be surprised if this is the day they had (sic) every road surrounded me and sitting and waiting at every intersection in my neighborhood."  Witness 2 later told the FBI that she immediately called CARROLL in response, and he (CARROLL) told Witness 2 that he just passed two Versailles Police Department officers and flipped them off, but they didn't arrest him.  CARROLL also told Witness 2 that cops were constantly driving past his house, but never would arrest him, and CARROLL thought Versailles Police were "fucking with him."  CARROLL added again that he was going to his house and getting his bombs.  Witness 2 interpreted this to show CARROLL's paranoia had escalated, felt that CARROLL was more "freaked out" than Witness 2 had ever witnessed, and feared CARROLL would use his bombs and guns against anyone trying to stop him.  Based on these concerns, Witness 2 called the Woodford County Attorney's Office and informed them that CARROLL had threatened to get his bombs and guns from his house.

e.  Later on March 18, 2021, CARROLL sent Witness 2 a text message expressing anger about a decision made by Witness 2 and her husband to deny CARROLL visitation with their children during the previous Christmas holiday.  Among other

17

things, CARROLL's message stated, "So fuck you. Fuck your fat ass bum husband. I'm half minded to pay his [sic] a visit. I'll kill the fat fuck."

f.   Also at a point in March 2021, Witness 2 received a text message from the phone labeled "Do Not Answer2", stating, "You rat snitch on me one more time and I might forget how much I love you!!!"

g.   On March 23, 2021, Witness 2 received a text message from the phone labeled "Do Not Answer2", stating "waited for you to quit fucking and still would have took uou (sic) back.  Nobody will love you like I do [Witness 2].  Your loss because I'm dead!"  Witness 2 then immediately received a second message from the same phone stating, "idc. I really don't I'm dying this week so I don't fucking care." Witness 2 later told the FBI that she feared that CARROLL was going to hurt himself or anyone that confronted him (CARROLL) to include the ones he loved.

20.    On April 11, 2021, pursuant to legal process, AT&T provided records to the FBI indicating CARROLL was the subscriber for telephone numbers 859-753-6708 and 859-753-4909.  The records also indicated that CARROLL was listed as the Billing Party for the device assigned to telephone 859-753-6708 with assigned IMEI number, 015026000137065 as of December 1, 2020.  Lastly, billing records for 859-753-6708 indicated the phone was active as of March 2020.

21.    On April 26, 2021, pursuant to an Order issued by this Court under 18 U.S.C. § 2703(d), Google provided records to the FBI indicating CARROLL registered Device 1 as a device using Google's services through its Android mobile operating system and listed the Google accounts finest.reliable.cleaning@gmail.com and btcdrystone@gmail.com as the users of

Device 1.  Google also provided non-content information associated with the email accounts finest.reliable.cleaning@gmail.com and btcdrystone@gmail.com, including the dates, times, senders, recipients, and subject lines of emails to and from those addresses.  A review of this email header information revealed an email chain between Made-in-China.com and finest.reliable.cleaning@gmail.com beginning in approximately January 2021.  The first email from Made-in-China.com bore the subject line "Explore Listings of Calcium Ammonium Nitrate."  A subsequent email in the chain was sent by Made-in-China.com, to finest.reliable.cleaning@gmail.com and anna@xztc-group.com, and bore the subject line "Notification Business Message from Ms. Anna".  The last email in the chain was from finest.reliable.cleaning@gmail.com to anna@xztc-group.com and bore the subject line, "Yes please send".[5]  In addition, the FBI conducted a search of open source information for information pertaining to email address anna@xztc-group.com and determined it is associated with Xuzhou Tianchang Chemical Company, LTD, Jiangsu Province, China.  According to the company's webpage, it specializes in nitrate and phosphate fertilizers.  Based on my

---

[5] The email header data listed the name of Witness 3, an individual previously unknown in the investigation, as the sender of the aforementioned last email in this chain.  Based on the identification of Witness 3's name and investigation of public records, the FBI located Witness 3 and interviewed Witness 3 about their relationship to Bryan CARROLL.  Witness 3 informed the FBI that s/he made CARROLL's acquaintance in 2019, at which time CARROLL informed Witness 3 that he intended to start a cleaning business.  Witness 3 told the FBI that s/he assisted CARROLL by using CARROLL's phone to create a Facebook page for the business and the Gmail account finest.reliable.cleaning@gmail.com.  Witness 3 informed the FBI that s/he had no further involvement with the business or the Gmail account beyond that.  In fact, when Witness 3 attempted to log in to the account using the password s/he created at the time of account creation, s/he received an error message requiring an authentication code to be sent to CARROLL's telephone number ending in 4909.  The email header data also listed the name of CARROLL's mother as an individual sending/receiving emails from the address finest.reliable.cleaning@gmail.com.  All information obtained in the investigation to date, however, indicates that Bryan CARROLL was the sole user of this email address and the sender and recipient of the emails described above.

consultations with explosives experts, I am aware that calcium ammonium nitrate is a utilized in the manufacture of explosives.

22.     Based on training, experience, and knowledge of this investigation, Affiant assesses that CARROLL intended to initiate a violent confrontation with law enforcement upon an attempt to apprehend him.  Affiant bases this assessment on CARROLL's accumulation of firearms and explosives on his person and at his residence and CARROLL's expressions of intent in his communications with Witness 2.  Based on CARROLL's writings in the notebook found in his residence, Affiant assesses that CARROLL formulated this plan, at least in part, in response to his perceived persecution for what he termed "petty crimes or drug use."

23.     Based on training, experience, and knowledge of this investigation, Affiant also assesses that Device 1 will contain evidence relating to CARROLL's communication of threats to Witness 2 and CARROLL's acquisition and manufacture of explosive materials and their precursor chemicals.  By his own admission, CARROLL manufactured a significant quantity of homemade explosives.  According to Witness 1, CARROLL used Device 1 as his primary internet connected device during this timeframe.  It follows that evidence relating to CARROLL's internet purchases of explosive precursor materials would be located on Device 1. Additionally, Affiant assesses that CARROLL communicated with other individuals about the acquisition of explosive precursors, and the research, training, manufacture, testing, transportation, and sale of explosives.  Affiant bases this assessment on CARROLL's statement to the FBI, in which he repeatedly used the words "we" and "they" as well as statements alluding to a lucrative market for explosives when describing the explosives, and in which he alluded to his "teachers" about explosives.

24.     Device 1 is currently in the lawful possession of the FBI, having been taken from CARROLL's person during his arrest.

25.     I know through my training and experience that devices such as the cellular phones collected in this case can be used as means of communication (including but not limited to voice calls, text messages, email, and social media) with coconspirators and participants in criminal activity.  I know that cellular phones can also be used to document events and activities through media such as photographs, video and audio recordings, written documents, and calendar entries.  I know that cellular phones can be used to conduct research on the internet about topics such as building IEDs.  I also know that cellular phones can be used to research and travel to locations of interest to criminal actors, including but not limited to locations for meetings with associates, vendors of materials used to make IEDs, and potential targets.

26.     While the FBI might already have all necessary authority to examine Device 1, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

27.     Device 1 is currently in storage at the FBI Lexington Resident Agency, 1648 McGrathiana Parkway, Suite 250, Lexington, KY 40511.  In my training and experience, I know that the Device has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as it was when the Device first came into the possession of law enforcement.

## **TECHNICAL TERMS**

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

22

This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

29.  Based on my training, experience, and research, I know that the Device has the

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS navigation device, and PDA.  In my training and experience, examining data stored on

24

device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

26

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device 1, as further described in Attachment A, to seek the information described in Attachment B.

## REQUEST FOR SEALING

35.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation, and not all sources of potential evidence will be searched at this time.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

**Signed remotely per FRCP 4.1.**

William Jackson
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 20, 2021:

UNITED STATES MAGISTRATE JUDGE